WHITFIELD SANFORD, PLAINTIFF IN ERROR, V. S. H. SORNBORGER, DEFENDANT IN ERROR.

[FILED APRIL 4, 1889.]

1. **Contracts**: DURESS. It is those contracts only which are made under fear of unlawful imprisonment, and not those made under fear of imprisonment which would be legally justifiable, that can be avoided for duress.

2. **Embezzlement**: CHATTEL MORTGAGE: RATIFICATION. A party being charged with embezzlement, executed a chattel mortgage to secure the debt, and retained possession of the mort-

gaged property for about a year and a half, when he delivered the possession thereof to the mortgagee. In an action of replevin thereafter brought by the mortgagor to regain possession of the property, *held*, on the facts proved, that he had ratified the mortgage.

3. **Contracts.** Duress which will avoid a contract is either by unlawful restraint or imprisonment; or, if lawful, it must be accompanied by circumstances of unnecessary pain, privation, or danger, or when the arrest, though made under legal authority, is for an unlawful purpose.

4. **Evidence.** Where papers or letters which are pertinent to the issue are offered in evidence on the trial of a case, they should be admitted. The court will not take notice how they were obtained, nor will it form a collateral issue to determine that question.

ERROR to the district court for Saunders county. Tried below before MARSHALL, J.

*J. R. & H. Gilkeson*, for plaintiff in error, cited: *Heaps v. Dunham et al.*, 95 Ill. 583; *Taylor v. Cottrell et al.*, 16 Id. 93; *Schommer v. Farwell et al.*, 56 Id. 544; *Mays v. Cincinnati*, 1 Ohio St. 278; *Seeds v. Simpson & Knox*, 16 Id. 328; *Mundy v. Whittemore*, 15 Neb. 651.

*S. H. Sornborger*, and *G. W. Simpson*, for defendant in error, cited: *Hatter v. Greenlee*, 26 Am. Dec. 374; Bishop on Contracts, Ed. 1887, sec. 715; *Baker v. Morton*, 12 Wall. (U. S.) 150, 159; *Taylor v. Jaques*, 106 Mass. 293; *Hullhorst v. Scharner*, 15 Neb. 57; *Eadie v. Slimmon*, 26 N. Y. 9; *Tapley v. Tapley*, 10 Minn. 360; *Robinson v. Gould*, 11 Cush. (Mass.) 55; *Foss v. Hildreth*, 10 Allen, (Mass.,) 80; Wharton's Evidence, sec. 482, 2d Ed., and cases there cited.

MAXWELL, J.

This is an action of replevin brought by the defendant in error against the plaintiff in error, to recover the possession of certain law books and book cases. On the trial

of the cause the jury returned a verdict in favor of the defendant in error, and a motion for a new trial having been overruled, judgment was entered on the verdict. The plaintiff in error claims an interest in the property in question by reason of a chattel mortgage executed thereon on the 24th day of May, 1883, and duly filed in the county clerk's office of Saunders county. The principal defense of the defendant in error is that the mortgage was executed under duress, and is therefore void. The plaintiff in error contends that the proof fails to show duress. At the time this transaction took place, the defendant in error was a son-in-law of the plaintiff in error, who then resided in Illinois, and the defendant in error had been loaning money for him for several years. The direct examination of the defendant in error is as follows:

Q. Do you remember about the time Mr. Sanford removed to Saunders county, Mr. Sornborger?

A. Yes, sir.

Q. You may state to the jury when it was.

A. It was in the fall of 1882, I believe— early in the winter.

Q. You may state what business transactions you had with him, soon after that, if any.

A. Mr. Sanford and his son made their business headquarters at my office in the winter of 1883; that is, early in the winter or along in the spring of 1883. I don't remember the time. I think it was in the spring, along perhaps in April or May, we had a settlement of our affairs.

Q. Well, what did you arrive at in that settlement? What difference did you find between you?

A. I can't recollect the amount, but it occurs to me that it was in the neighborhood of $6,000.

Q. In whose favor was that?

A. In favor of Mr. Sanford.

Q. Well, what was done in reference to that settlement, if anything?

A. At that time I had certain real estate, or had previously had certain real estate in this county, which I had sold; I had bought it as a matter of speculation and resold it, and among other things I tendered him, offered him the securities that I had in that, and I had retained titles, and conveyed the land to Mr. Sanford as far as that went. In addition to that, myself and brother had been doing horse business, and I had the furnishing of the most of the money in my name. I had considerable paper of that class, and quite an amount, amounting in all — aggregating — $6,000, in fact more than that; and I gave all the paper I had, I guess, in the world, pretty near. Then I gave him all the paper I had, or at least all I had in hand, including that I have described, and out of the paper he was to choose that that he wanted; that is, he desired to take the best, and he took it, and selected the desired amount out, and as I supposed, that was to end the difference.

Q. What followed then subsequent to that?

A. Prior to that time, some time in 1881, he loaned me the special or peculiar loan upon which he had no written evidence, unless it was my letters — an arrangement by which if I could make any deals on my own account in the way of purchasing personal notes or securities of that kind, I might draw on him for the money necessary until he told me to stop; I believe that was the arrangement, and I had agreed that that paper should, I think, stand as his security; that is, that he — I don't think as stated by Mr. Gilkeson in the opening that it was agreed that the paper should be taken in his name; at least I never took any in his name in that deal. The amount of money that I got of him for that purpose amounted to somewhere between $3,500 and $4,000; I was to pay him ten per cent, and if I could make any money over and above that, why I did it, and sometimes got discount and discounted paper; and it was understood that that should stand for his security in the matter; that is, such paper and security as I

might buy ———. Now I will go on. That was in 1881,
I should judge; perhaps it was in the latter part of 1880.
It was somewhere in the fall of 1880, or in the winter or
spring of 1881. ——— I find no data by which I can re-
fresh my memory on the subject. It was after I returned
from Denver, and that is all I can tell, and that was in
1880. It had run two or three years, and of course I had
collected and reinvested and disposed of much of the paper.
Much of it was ninety-day paper, and some of it a year;
and none of it I bought, or took, or had to deal with, was
more than a year; and of course I would collect and re-
invest, and owed him the principal sum on that account of
$3,500 or $4,000 — somewhere between. While we were
having our settlement we had some reference to that, and
he demanded very unexpectedly of me where those securi-
ties were. He had been in Wahoo some four or five
months; it had been sometime previous to that, the ar-
rangement had been made. I told him some of it got in
my business — horse business — got invested that way. In
talking about the matter, either at the first time — I think
perhaps it was a subsequent time, but before any talk of
securing the mortgage in question was made — he told me
in connection with this, he had been reliably informed that
he could hold me for embezzlement; that he had taken
counsel of Mr. Reese; that my disposition of that paper
was embezzlement. When we had reached an agreement
as to the amount of money that was due, Mr. Sanford had,
as I stated before, taken what notes I had, what I had in
the safe, and had taken them out to make inquiry and choose
from them; he came back with them in the office one day,
and he then said to me — he searched out what he would
like to take and let me have the rest — and now, he says,
here is this, and I want some security on it, or how do you
propose to secure it? and I told him that I thought it was
well enough secured; that it was such as I had; he had
the best; he had his choice; and he said then that he

wanted them guaranteed, and the guaranty secured on the library, by a mortgage on the library. I told him that I could not do that; that the library and few notes I had was about all I had left, and I did not want to part with it at all, and objected emphatically. Well, he says, you know that you have been guilty of embezzling this other paper, and you have not got it here, and you know I have been advised that I can successfully prosecute it, and I propose to do it, if you don't settle this matter up in my way, or words to that effect.

Q. What further conversation did you have at that time about it, if any?

A. Well, I was scared about the matter, nervous; did not want to be prosecuted.

Q. What did you tell him then?

A. Well, I told him that I would take it and consider the matter; that I did not know whether — did not believe that he had a case; did not know, but would let him know later. We had considerable talk about it and he went out.

Q. Was there anything said in that conversation in reference to your business there, or the effect of a prosecution of that kind by either party?

A. No, sir; I think before that time he had made a remark in the first talk that he should regret very much to make me any trouble, or injure my business, and I had concluded from that that he was not going to make any disturbance about the question one way or the other.

Q. Now did you, before the execution of the mortgage, have any conversation with him in reference to the security?

A. Yes, sir.

Q. When was that?

A. That was the day before the execution of this mortgage.

Q. When was that with reference to this conversation you have just related?

A. It was a day or two days afterwards — shortly afterwards. He had come back into the office for the purpose of ascertaining what I was going to do. He had taken his notes with him, those he had selected, and I took the rest.

Q. Was there any one present in the office at this conversation which you have detailed?

A. My brother was there.

Q. He came back the next day, or the next day but one, again, in pursuance of your agreement?

A. Yes, sir; he came back the next day, or the next day but one — I don't remember; it was the day before the final execution of this mortgage.

Q. Well, what occurred then?

A. He came into the office and wanted to know what I had made up my mind to do, and I said, Mr. Sanford, I cannot execute a mortgage on my library; and he at once says, Then I propose to prosecute you as far as I can; I propose to have this settled my way, and I can't take anything else.

Q. Well what further was said at that time?

A. He said, Then I propose to prosecute you at once. My brother was in there then; he had gone out, though, in the meantime, when this conversation had taken place, and we sat and talked, and after that, after he had gone, he told me again that he did not want to make me any trouble; that he regretted to do it; that he knew it would be injurious to my business, and he did not want to do that; but that he proposed to have this matter secured right now; that I had been guilty of certain irregularities with which he charged me, and guilty of this embezzlement, and he finally got my consent that I would execute this mortgage. The mortgage was not then filled out. He went away from the office with the agreement that the next morning we should fix it up and make this mortgage.

Q. What was the agreement about making it, preparing it, doing the clerical work?

A. The question arose then about describing the library,

and he wanted the books — names of them — taken down in detail; he said he would prepare a mortgage and I would take down the list of books, and the mortgage would refer to the list, and that had to be done before it could be executed. That night I prepared in my own handwriting a list of the books, and the next morning, in pursuance of that agreement, we went into the Saunders County National Bank and I executed this mortgage, and gave it to him.

Q. Do you know whether or not Judge M. B. Reese was prosecuting attorney in this district at that time?

A. I suppose that is not the best testimony; I know he had been; I don't know that he was then, Mr. Simpson; anyway; I can't tell as to that anyway.

Q. Was you alarmed at those threats of Mr. Sanford? You may state what effect those threats had upon you, if any, in reference to the execution of this mortgage.

A. Well, I was scared; I had been all the way through, from the time he first—I had been very much excited about the matter from the beginning of his first threat, because I knew that a prosecution, whether it was well or ill founded, would be my practical ruin in this place, especially by him under the circumstances.

Q. You may state what effect it had upon the execution of this mortgage?

A. That threat was the father of that mortgage; if it had not been for the threat, there would not have been any mortgage.

The defendant in error in his cross-examination evades a direct answer to a number of questions asked, particularly in regard to certain notes, amounting to from $2,000 to $2,500, which notes, it is claimed, belong to the plaintiff in error, but which the defendant in error had delivered to the First National Bank at Fremont to secure a loan to himself. In July, 1881, the defendant in error wrote to the plaintiff in error in regard to proposed loans, as follows: "During the spring and summer I have been

buying from time to time small notes variously secured, until I have now about $700 of such bills receivable; but have now more opportunities to buy than money to buy with. I get them at ten per cent, due generally in ninety days to one year, and I am led by the opportunity to make you a proposal by which, if you choose to accept, we can both get some money, *i. e.:* I will assign to you all I now have and all I hereafter buy, if you will advance the money necessary, money for future investments; I to pay you ten per cent for all so used; a separate account of such funds to be kept, and all the money to be paid on notes now held or hereafter bought, to be credited on that account, *i. e.,* to be placed to your credit, and none of that money to be used or credited to me until final settlement." In reliance upon the statements made in the letter, the funds in question seem to have been furnished. There is also a letter dated September 1, 1881, containing a statement showing the investment of the funds of the plaintiff in error to the amount of more than $3,000. On his cross-examination the defendant in error testified that at the time the plaintiff in error sought to take the property in controversy under the mortgage, he did not say to him that he could have it. He testifies in answer to questions:

Q. Was you not very badly scared at that time?

A. The statute of limitations had run against anything he could possibly do.

Q. For a criminal prosecution?

A. Yes, sir; I knew he would not be fool enough to commence an action when he knew the statute had run against anything he had.

Q. You felt satisfied that you could not go to the penitentiary?

A. You bet I did, then; and I wasn't quite sure of it before.

George I. Wright, an attorney of Wahoo, testifies that on or about the 30th day of June, 1883, and soon after the

execution of the mortgage in question, he had a conversation with the defendant in error at Wahoo as follows: "It was about noon one day when there had been a trial going on, I think upstairs here, but it may possibly have been in county court, and I saw Mr. Sornborger in the hall of the court house, down stairs, meet Mr. Sanford, and they shook hands and spoke to each other, and immediately afterward I spoke to Mr. Sornborger and asked him in substance how it came that the old gentleman would shake hands with him; and he said that the old gentleman and he always got along all right, and that there never would have been any trouble between them had it not been for Charlie."

This testimony is not denied. There is also a letter in the record, written by the defendant in error to his wife on the very day on which the mortgage in question was written, in which he says: " To father and mother I am under lasting obligations for kindness shown by them even in what was to them trying emergencies." This letter was objected to as " incompetent, immaterial, and irrelevant, shows on its face to be a communication to the wife of the plaintiff in this case, and is privileged." The letter was thereupon excluded, to which exception was taken. This is not an action between husband and wife, and the rule is well settled that where papers or letters are offered in evidence which are pertinent to the issue, they should be admitted, and the court will not form a collateral issue to determine whether or not they were lawfully obtained. ( *Geiger v. State,* 6 Neb. 545; *Legatt v. Tollervey,* 14 East, 302, 306; *Commonwealth v. Dana,* 2 Metc. [Mass.] 337.)

The person referred to as "father" in the above quotation from the letter, was the plaintiff in error.

On the 11th day of November, 1885, the plaintiff in error sought to take possession of the property in question for the purpose of foreclosing his mortgage. The testimony tends to show that the defendant in error stated that he was ready to give up possession of the property, and that an

arrangement was entered into between the parties whereby the property was to remain in the office of the defendant in error, but the possession to be in the plaintiff in error. This arrangement continued until about the time the sale was to take place, when the defendant in error instituted an action of replevin. The plaintiff in error denies that he made any threats against the defendant in error, but testifies that he stated that the acts of which he complained constituted embezzlement. The testimony clearly shows that there is a full consideration for the mortgage in question. Does the proof show that it was obtained by duress? We think not. Taking the testimony of ·the defendant in error and giving it its full force and effect, it fails to show duress. No case has been cited holding that such acts constituted duress, and after a pretty thorough examination of the cases, we have been unable to find any such decision.

In *Hullhorst v. Scharner,* 15 Neb. 57, where there was no consideration for the note and mortgage, and the testimony showed that it was obtained by means of threats to send the maker thereof to the penitentiary for an alleged, "indelicate, indecent, and injurious, examination of the daughter" of the mortgagee while treating her for a female difficulty, it was held that there was no consideration for the note and mortgage, and that it was obtained by threats of unlawful imprisonment and degradation. That case, however, seems to have no application to that under consideration.

In *Mundy v. Whittemore,* 15 Neb. 647, where a husband was charged with embezzlement and his wife gave a mortgage upon her separate property to secure the debt, it was held that the proof failed to show that the instrument was executed under duress.

The fact that a party is indebted to another and liable to a criminal prosecution, will not defeat the validity of an instrument given to secure such debt, unless it has been obtained by violence and undue means. It is those contracts

only which are made under fear of unlawful imprisonment, and not those made under fear of imprisonment which would be legally justifiable, that can be avoided for duress. (*Eddy v. Herrin,* 17 Me. 338; *Wilcox v. Howland,* 23 Pick. 167; *Waller v. Cralle,* 8 B. Mon. [Ky.] 11; *Alexander v. Pierce,* 10 N. H. 494; *Lester v. Union Man. Co.,* 1 Hun, [N. Y.,] 288; *Plant v. Gunn,* 2 Woods, [C. C.,] 372; *Landa v. Obert,* 45 Tex. 539; 6 Wait's Actions and Defenses, ch. 19; *Compton v. Bunker Hill Bank,* 96 Ill. 301; *Neally v. Greenough,* 5 Foster, [N. H.,] 325; *Alexander v. Pierce,* 10 N. H. 494; *Eddy v. Herrin,* 17 Me. 337; *Davis v. Luster,* 64 Mo. 43; *Knapp v. Hyde,* 60 Barb. [N. Y.] 80; 6 Am. & Eng. Encyc. of Law, 69.)

If this were not so, duress would be a complete defense to every recognizance given by a party to prevent his imprisonment. He could, with truth, say that he was compelled to execute it to avoid imprisonment. Such a plea, however, would be unavailing as a defense, although the instrument had been executed by the party as a matter of necessity in order that he might enjoy his liberty. So in the case at bar: the proof tends to show that the defendant in error had used notes in his business which belonged to the plaintiff in error, and to secure the amount due, he executed the mortgage in question. It was a lawful debt, and, so far as appears, was lawfully secured.

In *Neally v. Greenough, supra,* it is said: "A legal and proper arrest, upon the demand in question not designed to effect any other purpose than the obtaining of bail in the action, and unaccompanied with any severity or other impropriety of manner, is never to be deemed a duress. (2 Inst. 481; 2 Bac. Abr. 402; 1 Black. Com. 136; Shep. Touch. 61; *Richardson v. Duncan,* 3 N. H. 508.)"

In *Landa v. Obert,* 45 Texas, 547, the law is clearly and accurately stated, as follows: "Duress which avoids a contract, is either by unlawful restraint or imprisonment; or, if lawful, it must be accompanied by circumstances of

unnecessary pain, privation, or danger; or, when the arrest, though made under legal authority, is for an unlawful purpose, (*Phelp v. Zuschlag*, 34 Texas, 380,) or from threats calculated to excite fear of some grievous injury to one's person or property. * * * Viewing the evidence relied upon to prove duress in the most favorable light possible for appellee, it can amount to no more than threats of a criminal prosecution for embezzlement, and of a civil action for the money which appellant claimed had been wrongfully and fraudulently withheld from him by the appellee."

The case of *Keckley v. Union Bank*, 79 Va. 459, in some of its features resembled that under consideration, but the acts complained of were held not to constitute duress.

In *Colglaizier v. Salem*, 61 Ind. 445, the action was brought to recover back money paid to the defendant for license to sell intoxicating liquors, which the plaintiff alleged he had paid to the defendant " by reason of threats and menaces to prosecute him under said ordinances and in fear of arrest, fine, and imprisonment." The court held that no recovery could be had.

In *Bodine v. Morgan*, 37 N. J. Eq. 426, a father and son while in the plaintiff's employment appropriated to their own use certain store orders and goods. Upon the discovery of the appropriation, the father executed a mortgage upon his lands to secure the payment of the amount so abstracted. He continued in the employment of the plaintiff at intervals for nearly five years, and made no objection to the validity of the mortgage until after an action had been instituted to foreclose it. It was held that the plea of duress was not sustained.

Admitting all that is claimed by the defendant in error, the threatened arrest was to be for a lawful purpose. The alleged threats were not to be made with unnecessary pain, privation, or danger, nor such as to excite fear of grievous injury to his person or property, and were evidently not

intended for an unlawful purpose. The proof therefore fails to establish the defense.

The uncontradicted testimony shows that a year and a half after the execution of the mortgage in question, the defendant in error delivered the possession of the property in controversy to the plaintiff in error, and thereby ratified the mortgage.

It is unnecessary to review the instructions. As the testimony fails to make a case of duress, the jury could not under the evidence find that fact to exist. The court therefore should have set the verdict aside. The rule is that where there is testimony tending to prove the existence of certain facts, it must be submitted to the jury. Where, however, the testimony fails to establish the existence of such facts, the jury cannot go beyond the testimony and infer their existence. The judgment of the district court is reversed, and the cause remanded for further proceedings.

REVERSED AND REMANDED.

COBB, J., concurred.

REESE, CH. J., did not sit.